**UNION PACIFIC FUELS, INC., et al., Petitioners,**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Transwestern Pipeline Company, et al., Intervenors.**

**Nos. 93–1463, 93–1505, 93–1595, 93–1601 and 93–1603.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 30, 1997.

Decided Nov. 7, 1997.

Katherine B. Edwards, Washington, DC, argued the cause for petitioners, with whom Nancy J. Skancke, Donald Ayer and Norman A. Pedersen were on the briefs. Kerry R. Brittain entered an appearance.

Susan Court, Special Counsel, Federal Energy Regulatory Commission, Washington, DC, argued the cause for respondent, with whom Jay L. Witkin, Solicitor, John H. Conway, Deputy Solicitor, and Eric Lee Christensen, Attorney, were on the brief.

Jeffrey D. Komarow, Michael J. Thompson, Paul M. Flynn and Mark C. Moench, Washington, DC, were on the brief for intervenor Kern River Gas Transmission Company.

Before: EDWARDS, Chief Judge, GINSBURG and TATEL, Circuit Judges.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Chief Judge:

In January 1990, the Federal Energy Regulatory Commission ("FERC") approved the construction of a pipeline by Kern River Gas Transmission Company ("Kern River") that would transport natural gas from the Wyoming "Overthrust Region" to California. Kern River negotiated long term contracts with purchasers of its transportation services ("shippers") using the rate structure prevailing in the industry at the time. The rate structure in the gas pipeline industry passes on pipeline costs to shippers in two components: a reservation charge covering fixed costs, and a usage charge covering variable costs. Under "straight fixed/variable" rating (hereinafter "straight f/v"), all fixed costs are assigned to the reservation charge, which does not vary with use, and all variable costs are assigned to the usage charge, which does. Under "modified fixed/variable" rating (hereinafter "modified f/v"), some of the fixed costs are assigned to the reservation charge,

but some of the fixed costs, including return on equity and income taxes, are assigned to the usage charge along with all the variable costs. In 1990, modified f/v prevailed in the pipeline industry; Kern River's contracts with its shippers used modified f/v.

In 1993, implementing Congress' gradual deregulation of the natural gas industry, FERC issued its landmark Order No. 636,[1] which changed the basic rate structure in the gas pipeline industry from modified f/v to straight f/v in order to enhance competition between gas producers. In two successive subsequent orders, FERC required Kern River to replace the modified f/v rate design for which it had contracted with straight f/v. *Kern River Gas Transmission Company,* Docket No. RS92–65–000, *et al.*: "Order on Compliance with Restructuring Rule," issued March 2, 1993, 62 FERC (CCH) ¶ 61,191; "Order Accepting Revised Compliance Filing, Denying Rehearing and Granting Clarification," issued July 9, 1993, 64 FERC (CCH) ¶ 61,049 (collectively, *"Kern River* orders"). Petitioners, shippers who contracted with Kern River to use its transportation services, challenge the rate change on the grounds that it arbitrarily and unjustifiably reallocates risk away from Kern River and onto them, and on the grounds that FERC may not abrogate existing contracts unless imperatively demanded by the public interest.

We deny the petition for review. The *Kern River* orders do not abrogate the parties' contracts, but rather alter some of their terms in a permissible manner anticipated by the contracts themselves. While the orders do reallocate risk at the expense of Petitioners, FERC articulated a rational, nonarbitrary policy basis for its decision.

## I. BACKGROUND

FERC authorized construction of the Kern River pipeline to transport gas from the Wyoming "Overthrust Region" to California un-

**1.** Order No. 636, Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations, and Regulation of Natural Gas Pipelines After Partial Wellhead De-

control, III F.E.R.C. Stats. & Regs. (CCH) ¶ 30,-939, *order on reh'g,* Order No. 636–A, F.E.R.C. Stats. & Regs. (CCH) ¶ 30,950, *order on reh'g,* Order No. 636–B, 61 F.E.R.C. ¶ 61,272 (1992), *reh'g denied,* 62 F.E.R.C. ¶ 61,007 (1993).

der special "Optional Certificate" procedures authorized by the Natural Gas Act ("NGA") § 7, 15 U.S.C. § 717f. *See Kern River Gas Transmission Co.,* 50 FERC 61,069 (1990). These Optional Certificate procedures allow a pipeline builder to forgo a lengthy showing of a pipeline's usefulness and necessity when the builder assumes the economic risks associated with undertaking the project. Kern River negotiated contracts of various terms with Petitioners for a total of 98% of its capacity for fifteen years using the modified f/v rate that prevailed at the time. Joint Initial Brief of Petitioners 21.

Each contract contained a *"Memphis* clause," so named for *United Gas Pipe Line Co. v. Memphis Light, Gas and Water Div.,* 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958). The *Memphis* clause specified that "rates, charges, classifications and service" were subject to FERC regulation, and allowed Kern River to request and implement rate changes. Joint Appendix ("J.A.") 113–14. Two of the contracts, those between Kern River and Petitioners Mobil Exploration & Production U.S., Inc. ("Mobil") and Union Pacific Fuels, Inc. ("Union Pacific") expressly guaranteed that Kern River would not, without consent, "seek to change ... the modified fixed variable rate design." J.A. 28, 33. The other contracts guaranteed what the parties call "most favored nations" status, under which purchasers would receive a rate as good as the most favorable rate negotiated by any other party. The contracts, negotiated at arm's length, functioned in part as an allocation of risk between Kern River and Petitioners. The more of the fixed cost paid in reservation fees by Petitioners, purchasers of transportation services, the greater the percentage of risk assumed by them.

In 1992, FERC adopted Order No. 636, which effected a variety of changes in the natural gas market. For purposes of this case, the significant aspect of Order No. 636 was its alteration of the required rate design from modified f/v to straight f/v. *See* 18 C.F.R. § 284.8(d). This court upheld the rate design change in *United Distrib. Cos. v. F.E.R.C.,* 88 F.3d 1105, 1161–76 (1996) (per curiam), *cert. denied* —— U.S. ——, 117 S.Ct. 1723, 137 L.Ed.2d 845 (1997). FERC intend-

ed the rate change to facilitate the creation of a competitive, national gas market. Gas from different producers is carried on different pipelines, each of which has different fixed costs. When pipelines use modified f/v, the price paid by the purchaser varies depending on the fixed costs associated with the particular pipeline. When pipelines use straight f/v, the price to the customer more closely reflects the incremental cost of producing and transporting the gas, and thus, in FERC's view, will lead to a more competitive and efficient market. *See* Order No. 636, III F.E.R.C. Stats. & Regs. at 30,434.

In August 1992, after Order No. 636 took effect, Kern River applied to FERC to adopt straight f/v rate design for all of its shippers except Mobil and Union Pacific. J.A. 1. FERC responded by requiring straight f/v for all Kern River's shippers. 62 FERC at 62,262. Various parties, including Petitioners, filed for rehearing; Kern River asked for further clarification. In its second *Kern River* order, FERC concluded once more that straight f/v should be required for all customers. 64 FERC at 61,406. Although Order No. 636 permits exceptions to the straight f/v policy, FERC refused to make an exception for Kern River. It reasoned that the modified f/v rate design would artificially inflate the usage charges upon which gas purchasers base their buying decisions. This would distort the market in natural gas by creating an incentive for end purchasers to buy gas transported through straight f/v pipelines. 62 FERC at 62,257–58, 64 FERC at 61,407–08.

This challenge followed. The gravamen of Petitioners' complaint is that modified f/v places the risk of the pipeline's failure primarily on the pipeline owner, while straight f/v spreads this risk by assigning virtually all the fixed costs to shippers such as Petitioners, who pay reservation charges to guarantee themselves pipeline capacity. If, as here, the shippers reserve nearly all of a pipeline's capacity for a given period, a pipeline using straight f/v rate design will recover its fixed costs during that period irrespective of how much capacity the shippers actually use. In other words, although Order No. 636 aimed to rationalize pricing of natural gas for end

purchasers, implementing straight f/v in this case had a coincidental, different effect: it altered the original risk allocation for which the parties contracted, placing a higher burden on the shippers and reducing significantly the burden on Kern River. Petitioners seek to escape this alteration in risk allocation that will bind them for the length of the contracts.

## II. ANALYSIS

### A. *Standard of Review*

■ We review FERC orders under the arbitrary and capricious standard of 5 U.S.C. § 706(2)(A). *City of Seattle v. F.E.R.C.*, 883 F.2d 1084, 1087 (D.C.Cir.1989). Petitioners argue that the orders here must also satisfy the higher *Mobile–Sierra* standard. *See United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). *Mobile–Sierra* doctrine construes FERC's authority under NGA § 5 to order just and reasonable rates where FERC has found existing rates unjust and unreasonable. 15 U.S.C. § 717d. Under *Mobile–Sierra*, FERC may exercise this rate-making authority to abrogate existing contracts only where the public interest "imperatively demands" such action. *Metropolitan Edison Co. v. F.E.R.C.*, 595 F.2d 851, 856 n. 29 (D.C.Cir.1979).

■ Whether *Mobile–Sierra* doctrine applies is a question of contract interpretation:

The rule of *Sierra, Mobile,* and *Memphis* is refreshingly simple: The contract between the parties governs the legality of the filing. Rate filings consistent with contractual obligations are valid; rate filings inconsistent with contractual obligations are invalid.

*Richmond Power & Light v. F.P.C.*, 481 F.2d 490, 493 (D.C.Cir.1973). *Mobile–Sierra* applies only where FERC abrogates private contracts that do not contemplate FERC reform. *Mississippi Indus. v. F.E.R.C.*, 808 F.2d 1525, 1551–52 (D.C.Cir.1987), *cert. denied,* 494 U.S. 1078, 110 S.Ct. 1805, 108 L.Ed.2d 936 (1990). A contract between private parties may preserve FERC's right to impose new rates by "leav[ing] unaffected the power of the Commission ... to replace not only rates that are contrary to the public interest but also rates that are unjust [or] unreasonable." *Papago Tribal Util. Auth. v. F.E.R.C.*, 723 F.2d 950, 953 (D.C.Cir.1983). Alternatively, parties may contract to permit their own rate changes subject to FERC review, or may contract in such a way as to invoke *Mobile–Sierra* and thereby restrict FERC's ratemaking power to replacing rates contrary to the public interest. *Id.*

■ The contracts between Kern River and Petitioners anticipated rate changes by FERC, and thus *Mobile–Sierra* doctrine does not apply. The contracts were of the type that permitted FERC changes of unjust and unreasonable rates in addition to those contrary to the public interest. *See id.* All of the disputed contracts included *Memphis* clauses acknowledging FERC regulation of rates and permitting Kern River to request rate changes from FERC. The contracts provided for the possibility of rate changes in other ways, as well. For example, the Mobil and Union Pacific contracts provided that if FERC ordered rate changes raising Kern River's costs, Kern River could pass on some of those costs. 64 FERC at 61,412 n. 49. The contracts with the other Petitioners guaranteed the shippers rates as good as those offered to any other shipper.

Kern River's contracts with Mobil and Union Pacific included an additional clause providing that neither party shall "seek to change ... the modified fixed variable rate design." This language simply prohibited the parties from *requesting* from FERC, pursuant to NGA § 4, a change away from modified f/v. Nothing in the contracts expressly exempted the private agreement from rate changes initiated by FERC under NGA § 5. The parties could have, but did not adopt language that expressly limited FERC's right to change modified f/v to the public interest standard required by *Mobile–Sierra. See Papago,* 723 F.2d at 953. For example, the contracts could have stated expressly that modified f/v would apply unless FERC determined that it was not in the public interest. While Petitioners protest

that boilerplate language acknowledging rate changes by FERC should not render *Mobile–Sierra* doctrine inapplicable, and that the contracts implicitly anticipated use of modified f/v, they do not explain why they could not have adopted language that would simply and clearly have invoked *Mobile–Sierra*. Cf. *Northeast Util. Serv. Co. v. FERC*, 993 F.2d 937, 960 (1st Cir.1993) (contract provided that "the FERC shall not change the rate charged under this Agreement unless such rate is found to be contrary to the public interest"). Because *Mobile–Sierra* doctrine did not apply to these contracts, FERC did not have to show that public interest demanded straight f/v in this case.

### B. *Alleged Arbitrariness of Risk Reallocation*

■ Petitioners challenge the rate change on the theory that, as shippers, they entered long term, modified f/v contracts in reliance on Optional Certificate procedures under NGA § 7, and that the switch to straight f/v arbitrarily altered the carefully negotiated risk allocation embodied in those contracts. They claim that FERC did not provide a reasoned explanation for its change, and that Kern River has reaped unearned benefits by the lessening of its share of the economic risk of the pipeline.

In an order granting an Optional Certificate to one of Kern River's competitors, FERC stated:

> Although we cannot bind the actions of future Commissions, it is our intent that the negotiated rate design would not be subject to change in a future section 4 or section 5 rate proceeding, either by the applicant or by the Commission, because that rate design reflects the assessment of risk agreed to by the parties in order to construct the project.

45 FERC ¶ 61,234, 61,678 (1988). In the first *Kern River* order, FERC acknowledged that "the intent and anticipation of the Commission's original order issuing the Kern River [optional] certificates was to be consistent with [this language]." 62 FERC at 62,257.

Petitioners and Kern River probably did intend to negotiate risk allocation when they entered the long term contracts at issue here. It is also likely that they did not specifically anticipate FERC Order No. 636 and the resulting change from modified f/v, on which they relied, to straight f/v. Kern River may well have incurred some unexpected benefits as a result of the change, as Petitioners have incurred unexpected costs. Kern River now shoulders less of the risk of the pipeline, since it can recover return on equity and taxes through reservation charges, which it could not do under the original contracts; Petitioners now shoulder more of the risk.

Even assuming the correctness of all Petitioners' factual claims, however, it does not follow that FERC's orders were arbitrary and capricious. This case presents a paradigmatic example of an agency reasonably changing its policies, and implementing the consequences of those changes to the detriment of some parties and the benefit of others. Policy changes sometimes have distributive effects that may appear arbitrary from the perspective of their corporate victims, but in fact proceed logically from the reasoned premises underlying the changes. The policy changes may even have the effect of unsettling other policies that the agency has pursued or continues to pursue; but this is occasionally inevitable given the complexity of economic relations and administrative intervention. The problem of unsettling existing agency policies counsels caution, but does not bar policy changes. By formulating its policy in a reasoned fashion, FERC acted in a non-arbitrary manner; by justifying its decision to apply straight f/v to Kern River on the basis of promoting market efficiency, FERC satisfied its burden of providing reasoned explanation for its change in policy.

FERC's formulation and structuring of its policies from the outset acknowledged the possibility of policy change. FERC's statement of its future intent, *supra*, began with the caveat that FERC, like a legislature, cannot bind itself with respect to future policy changes. *See* 45 FERC at 61,678. Because of the possibility of future changes, the Optional Certificate regulations, which are still in effect, do not formally require that FERC maintain the rate structures negotiated by parties in their initial agreements.

Instead, the Optional Certificate regulations require a pipeline to abide ·by all operative FERC regulations. The Optional Certificate regulations permit a reservation charge "consistent with the conditions in [18 C.F.R.] § 284.8(d)." 18 C.F.R. § 157.103(d)(3). Order No. 636 changed the content of 18 C.F.R. § 284.8(d) from a modified f/v design to a straight f/v design. The Optional Certificate regulations continued to incorporate by reference the ·changed rate design.

No doubt, the possibility of FERC intervention in rate design makes it more difficult for the parties to allocate risk by means of contracts adopted pursuant to the Optional Certificate procedures. No rational corporation would, without some trepidation, enter a long term contract whose terms might be altered by highly unpredictable government intervention. The possibility of FERC intervention makes risk allocation difficult. Indeed, the *Kern River* orders conceivably could have the effect of chilling future Optional Certificate contracts, to the extent that pipeline builders and shippers may believe that significant shifts in their bargained-for risk allocations can and sometimes do occur. However, this possibility of future chilling belongs as one among the various factors that FERC could consider in exercising its administrative discretion. The one dissenting Commissioner in the *Kern River* rehearing order raised the issue of regulatory certainty as a concern, and justly so. 64 FERC at 61,436. Yet this concern, appropriate for FERC itself, does not establish arbitrariness for the purposes of this court.

In the first *Kern River* order, FERC justified its application of straight f/v to Kern River in terms of the broad policy change of Order No. 636 under which straight f/v became the rate design for the entire natural gas industry. First sketching the goal of competition at the wellhead, FERC pointed out that Kern River's usage rates under modified f/v of either $0.1852 or $0.2502 per thousand cubic feet ("Mcf") would drastically exceed its competitors' straight f/v charges of $0.0165 and $0.00478 per Mcf. 62 FERC at 62,258. If Kern River kept modified f/v, "the competitive distortion which the Commission has tried to prevent could occur." *Id.* Price

disparity in· the new competitive environment, FERC further argued, could put Kern River at a significant disadvantage vis-à-vis its competitors, and might even put it at risk of not recovering its· fixed costs. FERC concluded:

> On balance, we believe that the fundamental changes that are to occur in the natural gas industry under restructuring greatly outweigh the anticipation of the parties and the Commission when Kern River's original certificate authorization was being considered that the MFV methodology would not change.... Kern River's customers are in essentially no different a position now than the customers of any other pipeline who, in the past expected the Commission's former policy favoring MFV to continue.

*Id.* FERC's explanation for its decision sufficiently articulated the basis for its actions: the purposes of straight f/v "greatly outweigh" whatever harm might befall the parties as the result of a change in their initial expectations. Similar harms affected all natural gas customers who relied on the continuity of modified f/v, yet the court found the change from modified f/v to straight f/v to be permissible in *United Distrib. Cos.,* 88 F.3d at 1161–76.

In its second, clarificatory order on rehearing, FERC explained once more that, by implementing straight f/v, it intended to serve the general policy aim of Order No. 636: facilitating competition at the wellhead for natural gas sales. Noting the usage rate disparity between Kern River and its competitors that would result from allowing Kern River to maintain modified ⚬/v, FERC observed: ᵎ

> Shippers with different supply options would look to the usage charges of the competing pipelines to make market decisions. Therefore, Kern River's usage charge would cause distortions in the wellhead markets where merchants purchase gas for sale in the California market.

64 FERC at 61,407–08. In this second order, FERC acknowledged that imposing straight f/v shifted risk away from Kern River. "However," it reasoned, "the need to accomplish the important national policy

goals established by Order No. 636 outweighs any adverse effects of a change in the allocation of the risk of the Kern River project." *Id.* at 61,408. Finally, FERC explained in some detail that requiring Kern River to keep modified f/v while its competitors used straight f/v might have the effect of making it difficult for Kern River to recover its fixed costs because Kern River's services would be less attractive than those of its competitors. *Id.*

Thus, in both *Kern River* orders, FERC provided reasoned explanation for its decision to impose straight f/v. This decision resulted from the broad policy reorientation that favored creating competition at the wellhead by making gas prices reflect only the marginal cost of extraction and transportation, and not any fixed pipeline costs. Applying this policy generally meant that if Kern River, and none of its competitors, used modified f/v, the goal of price transparency and comparability would not be achieved in its market. It thus made regulatory sense to require Kern River to use straight f/v, even though the consequence of this decision was to reallocate risk that Kern River and Petitioners had already allocated. This was a reasoned trade-off, not an arbitrary decision, and lay within FERC's discretion.

### C. *Subsequently Granted FERC Exceptions*

■ Since the time when the *Kern River* orders were issued, FERC has permitted exceptions to its straight f/v rate requirement in several cases, including those of two of Kern River's competitors. Joint Initial Brief of Petitioners 34–36; Joint Reply Brief of Petitioners 20–21. Because these exceptions occurred after the orders under review, they play no role in our determination of the orders' legality. Although we may remand where FERC has formally altered its policy after issuing an order challenged before us, *see, e.g., Panhandle Eastern Pipe Line Co. v. F.E.R.C.,* 890 F.2d 435, 438 (D.C.Cir.1989), here Order No. 636 remains in place, and straight f/v remains the FERC-required default rate structure. Petitioners have the option to encourage Kern River to request a waiver of the straight f/v requirement similar to that obtained by its competitors. Al-

though straight f/v benefits Kern River, the bargaining power of Kern River's customers is hardly negligible in light of the ongoing relationship and long term interests of pipeline and customers alike.

### D. *Factual Hearing Request*

■■ Petitioners requested a hearing before FERC to determine whether justification existed for an exception to the straight f/v requirement, and now ask this court to remand for a hearing on the question because cost allocation "involves judgment on a myriad of facts." *United Distrib. Cos.,* 88 F.3d at 1167. This observation does not suffice to require a trial-type hearing where, as here, no material disputes existed. *See Moreau v. F.E.R.C.,* 982 F.2d 556, 568 (D.C.Cir.1993). FERC may resolve factual issues on a written record unless motive, intent, or credibility are at issue or there is a dispute over a past event. *Louisiana Ass'n of Indep. Producers & Royalty Owners v. F.E.R.C.,* 958 F.2d 1101, 1113 (D.C.Cir.1992). A trial-type hearing would not have facilitated what was at bottom a policy determination as to the relative importance of facilitating wellhead competition and preserving parties' risk allocation.

### III. Conclusion

FERC's orders reasonably instituted policy decisions whose distributive effects disadvantaged Petitioners. The orders were not arbitrary, capricious, or otherwise in violation of law, and they were adequately explained by FERC. The petition for review is denied.

*So ordered.*