**TRUNKLINE LNG COMPANY,**
Petitioner,

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.**

No. 98–1224.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 16, 1999.

Decided Oct. 15, 1999.

Brian D. O'Neill argued the cause for petitioner. With him on the briefs were Bruce W. Neely and F. Nan Wagoner. Merlin E. Remmenga entered an appearance.

Monique Penn–Jenkins, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were John H. Conway, Deputy Solicitor, and Susan J. Court, Special Counsel.

Before: WILLIAMS, SENTELLE, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

In 1977, Trunkline LNG Company ("Trunkline") applied to the Federal Energy Regulatory Commission (FERC)[1] for authority to construct and operate a liquefied natural gas (LNG) processing plant in Lake Charles, Louisiana. Although FERC granted that authority, the high cost of LNG eventually caused Trunkline to suspend its service. In 1996, Trunkline again sought approval for its LNG operations, as well as for rates that would permit it to recover depreciation expenses it had been unable to recover during the period of suspension. FERC granted Trunkline's application, but conditioned its approval upon exclusion of the unrecovered depreciation from Trunkline's rate base. FERC also conditioned its approval upon Trunkline filing a study of its costs and revenues within three years. Trunkline appeals both conditions. We affirm.

**I**

Trunkline received authorization in 1977 to construct and operate the Lake Charles plant and to sell regasified LNG to a single customer, an affiliate known as Trunkline Gas Company (Trunkline Gas). As a condition of authorization, FERC required Trunkline to file a tariff containing minimum bill provisions intended to allocate the risk of loss that would arise in the event of a suspension of service. Under the provisions of the minimum bill, in a period of interrupted service the customer would continue to pay rates that would permit Trunkline to recover its debt service and other nonequity-related fixed costs (interest and principal repayment, taxes, and fixed operating and maintenance expenses). It would not, however, be permitted to recover equity-related fixed costs (through depreciation expenses or otherwise) except to the extent that it actually provided service.[2] In the Commission's view, this arrangement ensured that Trunkline would be able to finance the project's construction, while equitably apportioning the risk of suspended or reduced operations between Trunkline's stockholders and its customer. *See Trunkline LNG Co.*, 82 F.E.R.C. ¶ 61,-198, at 61,781 (1998) (order denying rehearing).

Trunkline commenced delivery of LNG in 1982. Due to the high cost of the LNG it was obtaining from Algeria, however, Trunkline suspended operations from mid–1984 through 1989. Although Trunkline's customer received no service after the suspension, it continued to pay the nonequity fixed costs pursuant to the terms of the minimum bill. Pursuant to the same terms, Trunkline was unable to recover

---

1. Trunkline's original application was filed with the Federal Power Commission (FPC). The FPC ceased to exist on September 30, 1977 and most of its functions were transferred to FERC. *See* Department of Energy Organization Act, Pub.L. No. 95–91, § 402, 91 Stat. 565, 583 (1977) (codified at 42 U.S.C. § 7172(a)); Exec. Order No. 12,009, 42 Fed. Reg. 46,267 (1977).

2. During periods in which operations were reduced but not suspended, the tariff provided for a proportionate reduction of Trunkline's return on equity. *See Trunkline LNG Co.*, 82 F.E.R.C. ¶ 61,198, at 61,781 (1998).

$106.9 million in depreciation costs during this period.

On October 16, 1996, Trunkline filed the application at issue in this case, seeking a certificate of public convenience and necessity under section 7 of the Natural Gas Act (NGA), 15 U.S.C. § 717f. It once again sought authorization to provide terminalling services (receipt, storage, regasification, and delivery of LNG) at the Lake Charles plant, this time to customers other than Trunkline Gas. Trunkline's proposed rates were predicated upon a rate base that included the $106.9 million in depreciation the company had been unable to recover from 1984 through 1989.

Although FERC granted Trunkline's request for a certificate, it imposed two conditions. First, it required Trunkline to exclude the $106.9 million in unrecovered depreciation from its rate base. Inclusion of those costs, it said, would improperly permit Trunkline to earn a return on the depreciation expenses it did not recover because of the suspension of service. *See Trunkline LNG Co.*, 81 F.E.R.C. ¶ 61,147, at 61,666 (1997) (order issuing certificate). FERC also directed Trunkline, within three years of the start of operations, "to make a Natural Gas Act section 4 rate filing to justify its existing rates or to propose alternative rates." *Id.*

Trunkline sought rehearing with respect to the two conditions imposed on its certificate. The Commission denied rehearing, affirming its decision to exclude the depreciation costs but effectively modifying the three-year filing requirement. Rather than require Trunkline to make a filing justifying its rates or proposing new ones under NGA section 4, 15 U.S.C. § 717c, FERC simply directed Trunkline to file a cost and revenue study. The Commission indicated that it would review the study and only then determine whether it should exercise its authority to establish just and reasonable rates under section 5 of the NGA, 15 U.S.C. § 717d. *See* 82 F.E.R.C. at 61,780.

## II

■ We review FERC orders under the arbitrary and capricious standard of 5 U.S.C. § 706(2)(A). *See Union Pac. Fuels, Inc. v. FERC*, 129 F.3d 157, 161 (D.C.Cir.1997). We find nothing arbitrary or capricious about FERC's decisions here.

■ Trunkline argues that the Commission's refusal to allow it to include its lost depreciation charges in its rate base represents an unreasonable departure from the Commission's longstanding practice of allowing utilities to earn a return on their investments. Trunkline contends that it never had the opportunity to recover the lost depreciation, and hence should not be denied that opportunity now.

What Trunkline's analysis ignores, however, is that it *did* have the opportunity to recover that depreciation—if it had provided service from 1984 through 1989. Trunkline's failure to recover is simply a consequence of its failure to provide that service, a possibility contemplated by the tariff in effect at the time. The risk allocation reflected in that tariff was not an unreasonable one. Trunkline's shareholders obtained the benefit of being able to finance the Lake Charles plant and commence its operations, but bore the risk of losing part of their investment if business did not go well. Trunkline's customer obtained the benefit of LNG service, but also bore part of the risk since it would have to continue to pay under the minimum bill even if it received no service.

Moreover, whatever the rationality of the original 1977 tariff, it is far too late in the day to dispute that tariff now. The only question here is whether anything has changed that would make it unreasonable to require Trunkline to adhere to the terms of the arrangement originally struck in that year. In fact, nothing has changed. To the contrary, the subsequent interruption of service was precisely the circumstance the tariff anticipated, and the resulting preclusion of depreciation recovery flowed directly from the original risk allo-

cation formula. To permit Trunkline to recover its costs now would overturn that original allocation, permitting Trunkline's shareholders to recover a return on their equity notwithstanding the terms ·of the original arrangement.[3]

■ Trunkline makes much of the fact that the 1977 minimum bill was canceled when service to Trunkline Gas was abandoned, and argues that FERC's current open-access regulations now prohibit the imposition of such minimum bills. *See* Trunkline Br. at 26 (citing 18 C.F.R. § 284.8(d)). Trunkline failed to preserve this argument by failing to raise it in its rehearing request. *See* 15 U.S.C. § 717r(b); *United Distribution Cos. v. FERC,* 88 F.3d 1105, 1170 (D.C.Cir.1996). In any event, it misses the point. FERC's 1997 order does not impose a minimum bill on rates charged under the new certificate. Rather, it simply bars Trunkline from including in its new rate base those depreciation expenses it lost under the conditions of the prior tariff.

Finally, both Trunkline and FERC make reference to a 1991 settlement agreement which allowed Trunkline to make accounting entries recording the amount of its unrecovered depreciation. *See Trunkline LNG Co.,* 57 F.E.R.C. ¶ 61,022 (1991) (order approving contested settlement). That settlement has no consequences for this litigation. Far from disputing the import of the settlement, both Trunkline and FERC vociferously *agree* that while the settlement permitted Trunkline to record its lost depreciation, it did not determine whether the company would be able to recover that depreciation in the future. Rather, as the settlement order explained, the accounting treatment

was "nothing more than a method of keeping track of unrecovered depreciation for possible future application for rate recovery." *Id.* at 61,091. The settlement agreement itself specifically stated that:

> Nothing contained in this Stipulation and Agreement shall be taken to reflect a determination as to [Trunkline's] future right to recover the amount recorded in the memorandum account. Any such recovery in jurisdictional rates shall be subject to a filing, or filings, by [Trunkline] requesting authority for such recovery which is accepted and allowed to be placed in effect by the Commission....

*See* J.A. at 239. In short, the settlement did nothing more than leave the matter open for future dispute.

In the instant application, Trunkline requested authority to include the uncollected depreciation charges in its rate base, just as the settlement anticipated it would. FERC, however, rejected that request as it was equally free to do. Because we have found FERC's rejection reasonable, we have no basis for overturning it.

### III

Trunkline also disputes the second condition imposed in FERC's initial order: the condition that Trunkline make, within three years, "a Natural Gas Act section 4 rate filing to justify its existing rates or to propose alternative rates." 81 F.E.R.C. at 61,666. Trunkline argues that such a condition is in contravention of our holding in *Public Serv. Comm'n v. FERC (PSC),* that FERC may not require a natural gas company to periodically refile its rates pursuant to section 4. *See* 866 F.2d 487, 492 (D.C.Cir.1989). As we noted in *PSC,*

---

**3.** In its initial order, FERC ruled not only that inclusion of the lost depreciation in Trunkline's rate base was unjustified, but that it was also prohibited by a FERC regulation, 18 C.F.R. § 284.7(c)(5)(iii). *See* 81 F.E.R.C. at 61,666. That regulation states that a "pipeline may not file a revised or new rate designed to recover costs not recovered under rates previously in effect." In its order denying rehearing, however, FERC concluded that because inclusion of the depreciation was unjustified, it was "unnecessary to address whether the regulation would otherwise prohibit" it. 82 F.E.R.C. at 61,782. Because FERC did not rest its decision on the regulation, we need not address that question either, notwithstanding Trunkline's request that we do so.

FERC may, at any time, conduct an examination of a company's rates pursuant to section 5 of the NGA, 15 U.S.C. § 717d. Under that section, however, the burden of proof is on the Commission to show that the rates in question are not just and reasonable. *See PSC*, 866 F.2d at 488. By contrast, a section 4 filing and proposed rate change is initiated by the company, and it is the company that bears the burden of proving that its proposed rates are just and reasonable. *See* 15 U.S.C. § 717c(e). Accordingly, we held that FERC may not require periodic refilings under section 4, because such a procedure would effectively shift the burden of proof established under section 5. *See PSC*, 866 F.2d at 490.

We need not determine whether FERC's initial order in *Trunkline* would have contravened our *PSC* decision, because FERC apparently had second thoughts prior to its order denying rehearing. In the latter order, the Commission explained that it was not really requiring Trunkline to propose a change in its rates under section 4, but "merely" requiring it to file a "cost and revenue study" that would provide the basis for a section 5 filing by the Commission should it conclude one were necessary. 82 F.E.R.C. at 61,780. The Commission agrees that if it decides to go forward after reviewing the study, it will bear the burden of proof. Hence, the rehearing order does not implicate our holding in *PSC*.

■ Trunkline further contends that even if there is no section 4 problem, the requirement of a cost and revenue study is improper because it is unreasonable. There is no question that FERC has the authority to require Trunkline to submit such a study. Indeed, Trunkline conceded at oral argument that such a study is within FERC's power under section 10(a) of the NGA to require natural gas compa-

nies to file "such annual and other periodic or special reports as the Commission may ... prescribe as necessary or appropriate to assist the Commission." 15 U.S.C. § 717i(a).[4] FERC imposed the requirement because Trunkline had no recent history of continuous operation, and there was thus no relevant experience upon which to base forecasts of future costs or service levels. *See* 82 F.E.R.C. at 61,780. The Commission believed that within three years there would be such a history, which it could then review to determine whether Trunkline's rates were just and reasonable. As there is nothing arbitrary or capricious about that conclusion, we uphold the reporting condition as well.

## IV

We conclude that the conditions FERC imposed upon Trunkline's certificate are reasonable and in accordance with law. Accordingly, FERC's orders, as modified in the order denying rehearing, are affirmed and the petition for review is denied.

---

4. Section 10(a) authorizes FERC to "require that such reports shall include, among other things, full information as to ... gross receipts, interest due and paid, depreciation, amortization, ... cost of facilities, cost of maintenance and operation of facilities ... , and sale of natural gas." 15 U.S.C. § 717i(a).