United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued January 13, 2000 Decided March 24, 2000 

 No. 97-1092

 Exxon Corporation, et al., 
 Petitioners

 v.

 Federal Energy Regulatory Commission, 
 Respondent

 Consolidated Edison Company of New York, Inc., et al., 
 Intervenors

 On Petition for Review of an Order of the 
 Federal Energy Regulatory Commission

 Thomas J. Eastment argued the cause for petitioners. 
With him on the briefs were Marc C. Johnson, Bruce A. 
Connell, Jennifer S. Leete, Linda L. Geoghegan and Michael 
L. Pate.

 Timm L. Abendroth, Attorney, Federal Energy Regulatory 
Commission, argued the cause for respondent. With him on 
the brief were Jay L. Witkin, Solicitor, and Susan J. Court, 
Special Counsel. John H. Conway, Deputy Solicitor, entered 
an appearance.

 Marc Richter, Harvey L. Reiter, Richard Arlen Rapp, Jr., 
James H. Byrd, L. Clifford Adams, Jr., Allen Weinberg, 
Kenneth R. Carretta, John E. Holtzinger, Jr., Jacolyn A. 
Simmons and Kevin M. Downey were on the brief for 
intervenors. Kent K. Carter, Joel F. Zipp, Michael J. Fre-
muth, J. Paul Douglas and Mary L. Wright entered appear-
ances.

 Before: Williams, Randolph and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Williams.

 Dissenting opinion filed by Circuit Judge Randolph.

 Williams, Circuit Judge: This case arises out of the Feder-
al Energy Regulatory Commission's "unbundling" of inter-
state gas pipelines' sales and transportation service. As part 
of that unbundling, parties with firm rights to buy natural gas 
in the downstream areas served by Transcontinental Gas Pipe 
Line Corporation ("Transco") were given the right to convert 
their gas purchase entitlements into transportation service 
rights. They evidently all did so, and are known as the "FT 
conversion shippers." When Transco reached an unbundling 
settlement with its customers, these conversion shippers 
sought assurance that their rights to use of the pipeline 
upstream would be sufficiently firm. FERC responded affir-
matively, insisting that Transco give the service a priority 
that rendered it "essentially firm." Transcontinental Gas 
Pipe Line Corp., 55 FERC p 61,446 at 62,345-46 (1991) 
("Settlement Order").

 Ranged against the conversion shippers are "Indicated 
Shippers," led by Exxon, who are gas producers in Transco's 
production areas. They contend that if the conversion ship-
pers are to enjoy firm transportation service in the produc-
tion areas, they should pay for it in the way that is predomi-
nant for firm transportation service, i.e., by a two-part 

charge--first a reservation charge for the right to use the 
service, and second a usage charge covering the costs of 
actual usage.

 Transco filed tariffs under s 4 of the Natural Gas Act, 15 
U.S.C. s 717c, proposing such two-part rates, designating 
them "firm-to-the-wellhead" or "FTW" rates. (Petitioners 
note that this is technically a misnomer; the rates in fact 
would go only as far as producers' gathering systems. But, 
as have all the participants, we use the FTW label.) The 
Commission rejected the FTW rates, Transcontinental Gas 
Pipe Line Corp., 76 FERC p 61,021 ("Opinion No. 405"), 
denied rehearing, 77 FERC p 61,270 (1996) ("Opinion No. 
405-A"), and finally issued a further "Order on Rehearing 
and Request for Clarification," 79 FERC p 71,205 (1997), 
adhering to the rejection. The Indicated Shippers petition 
for review.

 The Indicated Shippers also attack prior decisions in which 
the Commission rejected two-part FTW rates that Transco 
had proposed under s 5 of the Act, 15 U.S.C. s 717d, Trans-
continental Gas Pipe Line Corp., 63 FERC p 61,194, rehear-
ing denied, 65 FERC p 61,023 (1993). We do not address 
those decisions directly. In the s 4 cases, we find no rea-
soned decisionmaking to support the Commission's rejection 
of Transco's filings. If on remand the Commission adheres to 
that rejection and justifies it, the Indicated Shippers' ability 
to secure relief under s 5 will probably be remote; if on 
remand the Commission accepts the Indicated Shippers' posi-
tion under s 4, then of course they will need no relief under 
s 5.

 * * *

 At stake are rates governing gas transportation on "later-
als" linking gas producers' gathering systems with Transco's 
main pipelines. Transco was an early unbundler, reaching an 
unbundling settlement with its customers in 1991. When 
FERC reviewed the settlement, representatives of the FT 
conversion shippers sought assurance of high priority for 
their use of these laterals. (The service is dubbed "IT-feeder 

service"; nominally interruptible, it feeds the conversion ship-
pers' entitlements to mainline capacity.) FERC agreed, or-
dering that

 Transco's tariff should specifically set forth the capacity 
 priority of Rate Schedule IT feeder service, i.e., that such 
 service is not firm but that it has priority over any other 
 interruptible service regardless of the date of the service 
 agreement.
 
Settlement Order, 55 FERC at 62,377. As everyone under-
stood at the time, including FERC, this grant of priority 
made Transco's IT-feeder service for the FT conversion 
shippers "essentially firm." Id. at 62,346. But the Commis-
sion did not direct two-part rates for this "essentially firm" 
service, and it has been subject to only a single volumetric 
usage charge.

 In 1992 the Commission adopted Order No. 636, extending 
its restructuring of the gas industry. See Pipeline Service 
Obligations and Revisions to Regulations Governing Self-
Implementing Transportation under Part 284 of the Com-
mission's Regulation of Natural Gas Pipelines after Partial 
Wellhead Decontrol, FERC Stats. & Regs. p 30,939 (1992). 
One of its goals was the creation of a "national gas market" 
with "head-to-head, gas-on-gas competition where the firm 
transportation rate structure is not a potentially distorting 
factor in the competition among merchants for gas purchasers 
at the wellhead and in the field." Id. at 30,434. To this end, 
FERC ordered that when pipelines provide firm transporta-
tion with a two-part fee structure, all fixed costs are allocated 
to the reservation charge so that the usage charge is based 
only on variable costs. This new rate design was called 
"straight fixed variable" ("SFV"). It replaced "modified fixed 
variable" ("MFV") pricing, under which the usage charge for 
any two-part rate included a portion of a pipeline's fixed 
costs. See United Distribution Cos. v. FERC, 88 F.3d 1105, 
1167-68 (D.C. Cir. 1996) (upholding FERC's abandonment of 
modified fixed variable pricing); see also 18 CFR s 284.8(d). 
With MFV the pipelines had varied in their allocation of fixed 
costs to the usage charge, and "[t]he Commission believed the 

MFV rate design distorted the unit delivered prices of gas, 
and thereby hindered the development of an efficient national 
market for gas." Municipal Defense Group v. FERC, 170 
F.3d 197, 199 (D.C. Cir. 1999). With SFV the Commission 
hoped "to promote competition at the natural gas wellhead by 
increasing the transparency of natural gas pricing." Texaco 
Inc. v. FERC, 148 F.3d 1091, 1094 (D.C. Cir. 1998).

 Because conversion from MFV to SFV often contradicted 
contracts between pipelines and purchasers, the Commission 
could require SFV only by invoking its authority to modify 
private contracts under the so-called "Mobile-Sierra doc-
trine." See Texaco Inc., 148 F.3d at 1096-97; see also 
United Gas Pipe Line Co. v. Mobile Gas Corp., 350 U.S. 332 
(1956); FPC v. Sierra Pacific Power Co., 350 U.S. 348 (1956). 
Under Mobile-Sierra, FERC may modify a contract rate 
provision if (but only if) the "public interest" so requires, a 
standard understood by all to demand more of a showing by 
FERC, in rejecting rates, than is needed to reject rates under 
the "just and reasonable" standard of s 5. See Papago 
Tribal Utility Auth. v. FERC, 723 F.2d 950, 953 (D.C. Cir. 
1983); Northeast Utilities Service Co. v. FERC, 993 F.2d 937, 
960 (1st Cir. 1993). In part because of FERC's insistence 
that the MFV rate design will "distort gas market pricing to 
the detriment of the 'integrated national gas sales market,' " 
we have upheld FERC's abrogation of private contracts to 
convert natural gas pricing to SFV. See Texaco, 148 F.3d at 
1097. Nonetheless, in the s 5 proceeding alluded to at the 
outset of the opinion, the Commission rejected Transco's 
effort to establish a two-part SFV rate for the IT-feeder 
service enjoyed by Transco's conversion shippers.

 Following a Commission suggestion, Transco made a s 4 
filing that proposed two-part SFV rates in the production 
areas. An administrative law judge to whom the Commission 
referred the matter rejected the rates on various grounds. 
Transcontinental Gas Pipe Line Corp., 72 FERC p 63,003 
(1995). Transco and Indicated Shippers filed exceptions with 
the Commission, which in its decision dropped nearly every 
aspect of the ALJ's analysis save the conclusion--that the 
proposed rates were unjust and unreasonable. See Opinion 

No. 405, 76 FERC p 61,021 (1996). The Commission began 
by repudiating the ALJ's highly critical view of two-part rates 
and SFV. First, "[a] reservation charge helps ration capaci-
ty, whether in the market area or in the production area." 
Id. at 61,060. Second, rebutting the ALJ's belief that a two-
part rate with reserved capacity was an anticompetitive "ty-
ing" practice, it said there was nothing anticompetitive about 
putting shippers to a choice regarding whether or not to 
reserve capacity: "These are the types of choices that con-
sumers are constantly required to make in a competitive 
marketplace." Id. Finally, any concerns regarding a tying 
effect once the choice to reserve was made were "tempered" 
by capacity holders' rights, established in Order No. 636, to 
release their capacity entitlements and thereby at least in 
part to offset the reservation costs. Id. at 61,061. In fact, 
"this flexibility is enhanced on Transco's system by the right 
of firm shippers to release capacity in segments in order to 
tailor their capacity needs and alternatives to fit their needs." 
Id. Indeed, the Commission had little choice but to defend 
two-part SFV rates; as it acknowledges, they are the pre-
dominant method of pricing firm service in the wake of Order 
636, Resp. Br. at 39, so a FERC repudiation would have 
risked regulatory upheaval.

 But the Commission found a catch in Transco's proposal, 
the 1991 settlement:

 Transco proposes, in effect, to unilaterally modify those 
 [1991] contracts so that the customer will pay a two-part 
 rate for essentially the same firm service on the supply 
 laterals. This is unacceptable. The customers must be 
 given an opportunity to choose between firm or interrup-
 tible service.
 
Opinion No. 405, 76 FERC at 61,061. Thus the Commission 
offered its support for an "open season" where Transco's 
customers would be allowed to choose between firm and truly 
interruptible service (i.e., service that can and will be inter-
rupted at times). Id. at 61,061-62.

 Indicated Shippers petitioned for rehearing. On the con-
tract abrogation argument, they argued that "[a] change from 

IT-feeders to FTW is a change in rate structure that changes 
the apportionment of costs, just as costs are shifted upon the 
adoption of a change in rate design or cost allocation method. 
Such a change does not constitute an abrogation of existing 
contracts." In other words, they said, Transco had proposed 
nothing different from the MFV-SFV shift that the Commis-
sion had routinely endorsed--had, indeed, imposed on parties 
by overriding contracts in the name of the public interest 
under Mobile-Sierra. The Commission, however, was reso-
lute in defense of the prevailing rates. Transco had proposed 
"a fundamental change to the rate design, not a mere cost 
reallocation." Opinion No. 405-A, 77 FERC p 61,270 at 62,-
127. "A cost reallocation will not change a one-part rate into 
a two-part rate; it will only change the level of existing 
charges." Id. Indicated Shippers petition for review.

 * * *

 Under s 4 of the Natural Gas Act a pipeline proposing a 
rate change has the burden of showing that the proposed rate 
is just and reasonable. If it meets that burden, FERC 
approves the rate regardless of whether there may be other 
rates that would also be just and reasonable. See Western 
Resources, Inc. v. FERC, 9 F.3d 1568, 1578 (D.C. Cir. 1993); 
Public Serv. Comm'n v. FERC, 866 F.2d 487, 488 (D.C. Cir. 
1989). The Commission is afforded a "narrow section 4 range 
of acceptance or disapproval of a pipeline's proposed 
changes." Public Serv. Comm'n, 866 F.2d at 491 (quoting 
Sea Robin Pipeline Co. v. FERC, 795 F.2d 182, 183 (D.C. Cir. 
1986)).

 The Commission concedes that "two-part rates are permis-
sible for firm service in the production area." Opinion No. 
405, 76 FERC at 61,061; see also 18 CFR s 284.8(d). In 
fact, FERC informs us that such rates are "predominant" for 
firm service in the production area. Resp. Br. at 39. Thus a 
logical first question might be: is Transco's IT-feeder service 
"firm service" of the sort for which SFV rates are, in FERC's 
words, "permissible" and "predominant"?

 FERC and the parties call the IT-feeder service "firm" or 
at least "essentially firm." The term "essentially firm" de-
rives from the 1991 settlement, see Settlement Order, 55 
FERC at 62,346, and FERC still agrees with that character-
ization. Opinion No. 405-A, 77 FERC at 62,129. The qualifi-
er--"essentially"--appears to derive from certain grandfa-
thered firm service that predated the 1991 settlement. See 
Settlement Order, 55 FERC at 62,345-46. The qualifier 
might also derive from the paradoxical characterization of IT-
feeder service in the Settlement Order, that it is "not firm" 
but also not to be interrupted. See id. at 62,377. FERC at 
times returns to this apparent doublespeak in Order No. 405, 
referring to "high priority, interruptible service." Order No. 
405, 76 FERC at 61,061. In this proceeding, FERC has at no 
time rested its decision on any claim that the qualifier "essen-
tially" is material. Accordingly, we treat the service as firm 
and the qualifier as immaterial, subject, of course, to the 
possibility that on remand the Commission may breathe life 
into the qualifier.

 And so we reach the central issue: if two-part rates are 
permissible and predominant for firm service in the produc-
tion area, and Transco is providing firm service in the produc-
tion area, how can Transco's proposed rate not be just and 
reasonable? The Commission offers two bases: first, the 
contracts don't allow it, and second, "customers must be given 
an opportunity to choose between firm or interruptible ser-
vice," what might be termed a "customer choice policy." 
Opinion No. 405, 76 FERC at 61,061.

 The Contracts

 The Commission's reliance on the prior contracts seems not 
to advance the case at all. After the Supreme Court enunci-
ated the Mobile-Sierra doctrine, it approved and gave effect 
to so-called "Memphis clauses," under which a pipeline by 
contract reserves the freedom to secure rate changes by 
standard filings with FERC such as those under s 4. See 
United Gas Pipe Line Co. v. Memphis Light, Gas and Water 
Div., 358 U.S. 103, 110-15 (1958); see also Union Pacific 

Fuels, Inc. v. FERC, 129 F.3d 157, 160 (D.C. Cir. 1997). 
Before us the Indicated Shippers assert, and the Commission 
does not dispute, that the contracts contained Memphis claus-
es. With a Memphis clause, the contract contemplates and 
allows section 4 filings and any "just and reasonable" rates 
that result from such filings. Thus we are puzzled by the 
Commission's insistence, in the opinions under review and its 
brief here, that Transco's filing was inherently an "abroga-
tion" of the contracts. For example, the Commission states 
that Transco seeks to "unilaterally modify those contracts," 
Opinion No. 405, 76 FERC at 61,061, and that "Transco's 
proposed unilateral change results in an abrogation of the 
contracts," Opinion No. 405-A, 77 FERC at 62,127. See also 
Resp. Br. at 41-42.

 But with a Memphis clause, where is the "abrogation"? At 
this point, one would suspect that part of FERC's theory of 
"abrogation" would be that the contracts gave rise to a 
Mobile-Sierra bar on two-part rates. Opinions No. 405 and 
No. 405-A certainly imply as much (although without discuss-
ing either Mobile-Sierra or Memphis). But FERC's brief 
disclaims the presence of a Mobile-Sierra bar. Resp. Br. at 
42. Rather, FERC describes its analysis as merely "tak[ing] 
existing private contractual agreements into consideration," 
id. at 42-43, citing three cases that purportedly encourage 
such consideration, one of which is the "Mobile" of Mobile-
Sierra. See id. at 43 (citing Mobile, 350 U.S. at 338-39; 
Associated Gas Distribs. v. FERC, 824 F.2d 981, 1009 (D.C. 
Cir. 1987); Cities of Bethany v. FERC, 727 F.2d 1131, 1139 
(D.C. Cir. 1984)).

 Associated Gas and Cities of Bethany are not similar to the 
situation Transco presents; they involve inquiries as to 
whether rates reached by private contract are discriminatory. 
And the Mobile citation is inapt because the Commission 
rightly disclaims any Mobile-Sierra bar in the contract. Giv-
en the presence of Memphis clauses, observations from these 
three opinions regarding "Congress's intention in the NGA to 
allow a vital role for private contracting between parties," 
Associated Gas, 824 F.2d at 1009, provide no apparent basis 

for rejecting a proposal for rates that undeniably meet the 
"just and reasonable" standard.

 Yet the Commission was ready to approve the rates under 
special circumstances; because the proposed change was too 
"fundamental," Opinion No. 405-A, 77 FERC at 62,127, Tran-
sco could apply it only after an open season. This position 
confirms that the Commission perceives no Mobile-Sierra 
bar. After such an open season, customers will either have 
firm service with a two-part rate or truly interruptible service 
with a purely volumetric rate; they will not have their 
original bargain.

 And so we are left with something of a purple cow. Ac-
cording to the Commission, Transco sought an abrogation of 
the contracts by proposing a two-part rate, but the original 
one-part rate is not protected by a Mobile-Sierra bar. The 
Commission must explain this state of affairs because it 
seems to defy the doctrines built upon Memphis and Mobile-
Sierra. Since Opinions No. 405 and No. 405-A do not discuss 
either of these cases, or their progeny, we safely conclude 
that there was inadequate explanation on this point.

 Customer Choice

 Perhaps intertwined with the theory of contractual abroga-
tion, the Commission concludes that as a matter of policy 
Transco's customers should get a choice as to whether they 
pay a reservation charge for their firm service. This policy is 
defended as something of a corollary of a policy that is part of 
the Commission's regulations: the choice between firm and 
interruptible service.

 An interstate pipeline that provides firm transportation 
 service under subpart B and G of this part must also 
 offer transportation service on an interruptible basis 
 under that subpart or subparts and separately from any 
 sales service.
 
18 CFR s 284.9(a)(1).

 Back at the time of the settlement, Transco's customers 
made a choice between firm and interruptible service; they 
specifically asked FERC to guarantee them firm rights on 

the IT-feeders, and FERC did so. The customers also 
received (temporarily, because of the Memphis clause) some-
thing of a windfall--firm service but without paying for their 
entitlement to capacity. Before these customers can be 
forced to pay for their firm service in the predominant 
manner (i.e., two-part rates), FERC says they must be given 
a new choice

 between purchasing a higher quality firm service with a 
 reservation charge or purchasing a lower quality inter-
 ruptible service without a reservation charge.
 
Opinion No. 405, 76 FERC at 61,060. See also Opinion No. 
405-A, 77 FERC at 62,124 n.3 (speaking of the desirability of 
customer "choice of a higher quality firm service with a 
reservation fee and a lower quality interruptible service with-
out a reservation fee" (emphasis added)).

 For practical purposes, the choice between firm and inter-
ruptible service will usually entail a choice between two-part 
and one-part rates. Two-part rates predominate for firm 
service, and interruptible service has only a one-part rate. 
The choice made in Transco's settlement did not correspond 
to this model, but the Commission does not make a coherent 
case as to why the new choice is required, or why a two-part 
rate structure--not merely permissible but predominant for 
the service chosen--is unjust or unreasonable.

 The Commission calls the imposition of a two-part rate a 
"fundamental" change in the rate structure, but a significant 
chunk of the Commission's opinion disclaims the criticism of 
reservation charges found in the ALJ opinion. See Opinion 
No. 405, 76 FERC at 61,060-61. The Commission does offer 
the terse conclusion that "[a] cost reallocation will not change 
a one-part rate into a two-part rate; it will only change the 
level of existing charges." Opinion No. 405-A, 77 FERC at 
62,127. We are unsure why this should be relevant. The 
basic idea of a Memphis clause is to reserve to the utility the 
power to file tariffs that can take effect if they pass Commis-
sion scrutiny under its ordinary standards: thus, if a filing 
under s 4 proposes rates that are just and reasonable, as 
these concededly are, they are to be accepted--regardless of 
the justness and reasonableness of the former rates.

 FERC's resistance here is especially odd in light of its 
aggressiveness in shifting pipelines with two-part rates from 
MFV to SFV. If inclusion of a few fixed costs in the usage 
component of a two-part charge was so distortive of the 
market as to require the Commission's use of the Mobile-
Sierra public interest standard to effect the MFV-SFV con-
version, one would suppose a one-part charge for firm cus-
tomers, with all fixed costs in a purely volumetric charge, 
would be similarly offensive. The Commission's opinions in 
this case do not explain why Order No. 636's principles are 
not at play here on the side of the Indicated Shippers.1

 The policy embedded in the regulations is a choice between 
firm and interruptible service, and Transco's customers made 
that choice in 1991. They got firm service and a one-part 
rate; the pipeline got a Memphis clause. The Commission's 
new policy that Transco's customers get a second choice 
(framed as one between two packages, firm service with a 
reservation charge or interruptible service without) rests on 
some heretofore unspoken reason why a reservation charge 
for firm service--concededly just and reasonable--is not just 
and reasonable because the customers had previously been 
receiving firm service under a purely volumetric charge. The 
Commission's insistence that the change can be made only by 
an open season seems to amount to a belief that customers, 
having already elected firm service, must now be asked, 
"Firm service--is that your final answer?" Why this second 
bite at the apple is needed remains a mystery.

 * * *

 Because the Commission has failed to "cogently explain 
why it has exercised its discretion in [the] given manner," 

__________
 1 FERC's regulations provide that "[w]here the customer pur-
chases firm service, a pipeline may impose a reservation fee or 
charge on a shipper as a condition for providing such service." 18 
CFR s 284.8(d) (emphasis added). This regulation did not figure 
prominently in arguments on appeal. It certainly implies that 
reservation fees are not required with firm service; it expressly 
provides that they are permissible.

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. 
Auto. Ins. Co., 463 U.S. 29, 48 (1983); 5 U.S.C. s 706(2)(A), 
we reverse and remand the case for reconsideration in light of 
this opinion.

 So ordered.

 Randolph, Circuit Judge, dissenting: No party denies that 
Transco could exercise the Memphis clause and propose a 
rate change. But the Commission still had a statutory duty 
to ensure that the company's s 4 proposal was "just and 
reasonable." 15 U.S.C. s 717c. The Commission performed 
that duty and rejected Transco's filing because it did "not 
allow for a real choice of service options on Transco's supply 
laterals." 76 F.E.R.C. at 61,061. I believe the Commission 
offered a reasoned explanation for its decision.

 The majority makes much of the Commission's mention of 
"abrogation of contracts," but then recognizes that this ratio-
nale is "perhaps intertwined" with the customer choice policy. 
Maj. op. at 10. Indeed, reference to the existing contracts 
was not an independent ground of the Commission's decision, 
but a necessary consequence of the customer choice policy. 
If two-part rates are just and reasonable only when custom-
ers have already elected a reservation charge, then the 
Commission must ask the simple question whether the cus-
tomers have in fact chosen a reservation charge. The Com-
mission indicated that it would allow a change in rates after 
an open season, which would alter the bargain in the original 
contract. See id. This demonstrates that the Commission 
was not nullifying the Memphis clause.

 Thus, the real question is whether the Commission was 
arbitrary and capricious in rejecting Transco's proposal based 
on the customer choice policy. The Commission has rejected 
the idea of an outright ban on reservation charges, noting 
that such charges offer advantages to customers. See 76 
F.E.R.C. at 61,059 (citing Order No. 436, 50 Fed. Reg. 42,408 
(1985)). But the Commission also recognizes that reservation 
charges tie customers to the pipeline, creating an incentive to 
use the pipeline even if more efficient service can be obtained 
elsewhere. See 76 F.E.R.C. at 61,060. The Commission thus 
decided that it is best left to individual customers to "weigh 
whether the advantages of obtaining a firm right to service on 
the pipeline are worth the limits which the reservation charge 
will inevitably impose on the desirability of its switching to 
supplies on another system." Id. Because Transco's propos-
al denied conversion shippers an opportunity to make this 

cost-benefit analysis for themselves, the Commission rejected 
it.

 The majority emphasizes that customers have already cho-
sen firm service. See maj. op. at 12. But the question is not 
whether customers already elected "essentially firm" service. 
The question is whether they already elected two-part rates. 
It is uncontested that they did not. The majority also finds 
the Commission's decision "especially odd" because it suppos-
edly conflicts with Order 636's principle against fixed costs in 
usage charges. See id. This takes Order 636 too far. The 
Commission there decided only that "[i]f a reservation fee is 
charged, it must recover all fixed costs attributable to the 
firm service....." 18 C.F.R. s 248.8(d) (emphasis added). 
To find that fixed costs could never be included in usage 
charges would require doing away with interruptible service 
(which is necessarily a one-part rate), something the Commis-
sion certainly did not intend. According to the majority, the 
Commission rejected as unjust and unreasonable a two-part 
rate that is the "predominant manner" of "firm service." 
Maj. op. at 11. This forgets that the predominant manner of 
service overall is to allow customers to choose whether to pay 
a reservation charge and receive firm service or to reject the 
reservation charge and receive lower priority service. In-
deed, the majority does not cite a single case (in either s 4 or 
s 5 proceedings) in which the Commission approved two-part 
rates when customers had not previously made the calculation 
that reservation charges would be advantageous.

 I therefore dissent.