**WABASH VALLEY POWER ASSOCIATION, INC., Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**American Electric Power Company, Inc., Intervenor.**

No. 00–1297.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 7, 2001.

Decided Nov. 2, 2001.

James T. Malysiak argued the cause for petitioner. With him on the briefs was Lee A. Freeman, Jr.

Andrew K. Soto, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief was Susan J. Court, Associate Solicitor.

J.A. Bouknight, Jr. argued the cause for intervenor. With him on the brief were Douglas G. Green and Samuel T. Perkins. Shannen W. Coffin entered an appearance.

Before: GINSBURG, Chief Judge, EDWARDS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

American Electric Power Co., Inc. ("AEP") and Central and South West Corp. ("CSW"), two large regional utility holding companies, jointly petitioned the Federal Energy Regulatory Commission ("FERC" or "Commission") for merger approval, as required by § 203 of the Federal Power Act, 16 U.S.C. § 824b(a) (1994). When presented with a merger or acquisition request, FERC "shall approve" the request if the merger or acquisition "will be consistent with the public interest." *Id.* After lengthy review, FERC *conditionally* approved the AEP-CSW merger and required the combined company, referred to as New AEP, to divest certain generation assets and share transmission capacity information. *See Am. Elec. Power Co. & Cent. & S.W. Corp.*, 90 F.E.R.C. ¶ 61,242, 2000 WL 280781 (Mar. 15, 2000). Wabash Valley Power Association, Inc. ("Wabash"), an Indiana competitor and customer of AEP, petitions for review.

Wabash contends that FERC's decision was both procedurally and substantively defective. Many of Wabash's claims have been forfeited, however, because they were not properly raised with FERC in the first instance. Therefore, these claims may not be considered by the court. And we find no merit in the claims that are properly before this court.

Because AEP and CSW sought merger approval in the midst of sweeping regulatory changes in the electric industry, FERC chose to impose "interim" mitigation measures to limit New AEP's market power. Wabash contends that FERC's approach is improper under the Federal Power Act, because the interim measures are deficient. We disagree. On the record at hand, we find that FERC acted reasonably in adopting two stages of restrictions to limit New AEP's market power. Both stages of restrictions adequately limit New AEP's ability to strategically manipulate electricity generation to cause transmission bottlenecks. We also reject Wabash's claims that FERC's merger approval should be overturned because it is inconsistent with subsequent staff statements and because it did not fully eliminate rate pancaking. These claims have no bearing on the question of whether FERC's approval of the merger was arbitrary and capricious. We therefore deny Wabash's petition for review.

## I. BACKGROUND

AEP and CSW sought to merge in the midst of a seachange in the regulations governing the electricity industry. Because many of the issues raised by petitioner relate to the application of these new regulations, we begin with a brief summary of the current regulatory landscape and then move to the procedural history of this case.

### A. Current Regulations

By amending portions of the Federal Power Act of 1935, the Energy Policy Act of 1992 authorized FERC to order utilities to transmit other sellers' power over their transmission lines on a case-by-case basis. *See* Pub.L. No. 102-486, 106 Stat. 2776, 2915-16 (1992) (codified at 16 U.S.C. §§ 824jk); *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C.Cir.2000) (hereinafter *Transmission Access*) (discussing history), *cert. granted sub nom. New York v. FERC*, 531 U.S. 1189, 121 S.Ct. 1185, 149 L.Ed.2d 102 (2001). Finding that utilities would use their market power to deny transmission access to competing generation sources,

FERC subsequently used its statutory authority, see 16 U.S.C. §§ 824d(b), 824e(a), to require utilities to provide open access to their transmission lines in a nondiscriminatory fashion. See *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities*, Order No. 888, 61 Fed. Reg. 21,540 (May 10, 1996), *clarified*, 76 F.E.R.C. ¶ 61,009, 1996 WL 363765 (July 2, 1996) and 61 Fed. Reg. 51,696 (Oct. 3, 1996), *on reh'g*, Order No. 888-A, 62 Fed. Reg. 12,274 (Mar. 14, 1997), *clarified*, 79 F.E.R.C. ¶ 61,182, 1997 WL 257595 (May 16, 1997), *on reh'g*, Order No. 888-B, 62 Fed. Reg. 64,688 (Dec. 9, 1997), *on reh'g*, Order No. 888-C, 82 F.E.R.C. ¶ 61,046, 1998 WL 18148 (Jan. 20, 1998), *aff'd*, *Transmission Access*, 225 F.3d 667, *cert. granted sub nom. New York*, 121 S.Ct. 1185. Order No. 888, among other things, set forth the framework for creating Independent System Operators ("ISOs"), independent companies that manage transmission facilities owned by utilities. 61 Fed. Reg. at 21,596. ISOs have no financial stake in any power market participant, have the ability to halt generation causing transmission system constraints, and must provide real-time transmission information to market participants. *Id.*

At the same time, FERC also issued Order No. 889 which required all owners and operators of electricity transmission systems to participate in an Open Access Same-time Information System, or OASIS. *Open Access Same-Time Information System and Standards of Conduct*, Order No. 889, 61 Fed. Reg. 21,737 (May 10, 1996), *on reh'g*, Order No. 889-A, 62 Fed. Reg. 12,484 (Mar. 14, 1997), *on reh'g*, Order No. 889-B, 62 Fed. Reg. 64,715 (Dec. 9, 1997), *aff'd*, *Transmission Access*, 225 F.3d 667, *cert. granted sub nom. New York*, 121 S.Ct. 1185. One of the main functions of an OASIS is to calculate Available Transmission Capacity ("ATC"), the difference between a transmission system's total capacity and already-committed capacity. Order No. 889, 61 Fed. Reg. at 21,749. Because ATC often limits where electricity can be sold, this information allows generators to determine additional potential markets.

In 1999, FERC found that the changes brought by Orders Nos. 888 and 889 had imposed significant strain on "traditional means of grid management" and that "continued discrimination in the provision of transmission services by vertically integrated utilities may also be impeding fully competitive electricity markets." *Regional Transmission Organizations; Notice of Proposed Rulemaking*, 64 Fed. Reg. 31,-390, at 31,391 (June 10, 1999). Although Orders Nos. 888 and 889 reduced overt discrimination, transmission-owning utilities resorted to "more subtle means to frustrate their marketing competitors and favor their own marketing interests." *Id.* at 31,402. As a consequence, the Orders were ineffective in completely removing transmission discrimination. Functional limitations arising from the relatively small size of the ISOs also limited their ability to provide essential information accurately, such as ATC: "it is not possible to calculate accurately the transmission capability of one system without knowing the flows scheduled by all other interconnected transmission providers in the region." *Id.* at 31,403.

In response to the shortcomings of Orders Nos. 888 and 889, FERC issued Order No. 2000, which established the framework for Regional Transmission Organizations, or RTOs. See *Regional Transmission Organizations*, Order No. 2000, 65 Fed. Reg. 810 (Jan. 6, 2000), *on reh'g*, Order No. 2000-A, 65 Fed. Reg. 12,088 (Mar. 8, 2000), *petitions for review pending sub nom. Public Utility District No. 1 of Snohomish County, Washington v. FERC*, No. 00-1174 (D.C.Cir. argued

Oct. 17, 2001). RTOs build upon many ISO features and have four main characteristics: independence, sufficient size and regional scope, operational authority for all transmission facilities under their control, and exclusive authority for maintaining short term grid reliability. 65 Fed. Reg. 810, at 842–75. FERC requires RTOs to be larger, more independent, and exercise more sophisticated control over the transmission system than ISOs. In 2001, FERC further clarified the scope requirements of RTOs, forcing several parties into mediation with an ultimate goal of creating four RTOs – one for the Northeast, Southeast, Midwest, and West. *See, e.g., Order Provisionally Granting RTO Status,* 96 F.E.R.C. ¶ 61,061, 2001 WL (July 12, 2001).

## B. Procedural History

AEP and CSW jointly applied to FERC for merger approval on April 30, 1998. At that time, AEP, through wholly–owned subsidiaries, provided power to three million customers in Indiana, Kentucky, Michigan, Ohio, Tennessee, Virginia, and West Virginia with over 23,000 megawatts ("MW") of generating capacity and 22,000 miles of transmission lines. *Am. Elec. Power Co.,* 90 F.E.R.C. ¶ 61,242, at 61,776. CSW, also through wholly-owned subsidiaries, served 1.7 million customers in Arkansas, Louisiana, Oklahoma, and Texas with over 14,000 MW of generating capacity and 16,000 miles of transmission lines. *See Joint Application of Am. Elec. Power Co., Inc. & Cent. & S. W. Corp.* (Apr. 30, 1998), *reprinted in* Joint Appendix ("J.A.") 134, 165 (hereinafter *"Joint Application"*).

To determine whether a proposed merger meets the Federal Power Act's § 203 public interest standard, FERC requires applicants to conduct a competitive analysis screen, referred to as an Appendix A analysis, using the framework established by the Department of Justice/Federal Trade Commission Merger Guidelines.

*See Inquiry Concerning the Commission's Merger Policy Under the Federal Power Act; Policy Statement,* 61 Fed. Reg. 68,-595, at 68,606 (Dec. 30, 1996). The Appendix A analysis requires applicants to:

1) identify the relevant products;
2) identify customers who may be affected by the merger;
3) identify potential competing suppliers to each identified customer; and
4) analyze market concentration, using the Herfindahl–Hirschman Index ("HHI") before and after the merger.

*Id.* at 68,607–08.

In their original application, AEP and CSW proposed connecting their two territories using a 250 MW east to west transmission path, secured by contract from a third party. *Joint Application, reprinted in* J.A. 138. Because this connection increased market concentration in several western markets to a level above that allowed by Appendix A, AEP and CSW sought to mitigate these impermissible HHI levels by committing to the sale of 320 MW in the former territory of CSW. *Joint Application, reprinted in* J.A. 145. AEP and CSW also suggested other restrictions, including participation in an ISO and the waiver of certain priority transmission rights. *Joint Application, reprinted in* J.A. 150.

FERC found that the "Applicants' own analysis shows that the proposed merger fails the screen thresholds in several markets, . . . there are problems concerning the assumptions and data used in the Applicants' screen analysis, . . . [and] Applicants' analysis may not accurately define relevant geographic markets." *Order Accepting for Filing and Suspending Proposed Tariffs and Agreements, Consolidating Dockets, and Establishing Hearing Procedures,* 85 F.E.R.C. ¶ 61,201, at 61,-818–19, 1998 WL 785787 (Nov. 10, 1998). These factors led FERC to set the matter

for a hearing to determine "the effect of the merger on competition." *Id.* at 61,809.

Over 30 parties filed objections to the merger, though most withdrew prior to the hearing. FERC trial staff and the Applicants entered into two stipulations, one on May 24, 1999, and the other on July 13, 1999, resolving most of the issues in contention at the hearing. The three-week hearing finished on July 19, 1999, and the presiding Administrative Law Judge ("ALJ") issued an initial order on November 23, 1999. The ALJ's initial order imposed no conditions on the merger, other than those stipulated by the Applicants. *See Am. Elec. Power Co.*, 90 F.E.R.C. ¶ 61,242, at 61,776. On May 15, 2000, FERC approved the merger, but with significant additional conditions. *Id.* at 61,-799–800.

The Applicants had agreed to divest 550 MW of power, rather than the initially proposed 320 MW, from the West Region. Instead of divesting entire plants, the Applicants proposed selling minority interests in certain generating facilities, leaving New AEP with operational control of generation. FERC found the amount of capacity to be divested acceptable but that the divestiture proposal was an ineffective remedy because the Applicants retained operational control of the generation. This operational control could have given New AEP "the ability to withhold capacity from the market and thus affect electricity prices." *Id.* at 61,792. FERC therefore required New AEP to "divest their entire ownership interest" in the facilities at issue. *Id.* Because of the time necessary to divest this capacity, the Applicants proposed forced interim power sales equivalent to the to-be-divested capacity. FERC accepted this proposal, recognizing that the forced sales would prevent the exercise of market power by withholding output, but required the sales to begin immediate-ly rather than shortly after merger, as the Applicants had proposed. *Id.* at 61,794.

FERC also addressed market power concerns arising out of the consolidation of generation and transmission. FERC recognized the potential for New AEP to exercise vertical market power, where one entity could affect the availability of transmission by controlling the generation of electricity, and found "that Applicants failed to show that the proposed merger will not adversely affect competition as a result of combining their generation and transmission." *Id.* at 61,786. To remedy this market power, FERC imposed several requirements. First, the Applicants must "transfer operational control of their transmission facilities to a Commission–approved RTO." *Id.* at 61,788. Second, because, under FERC's newly established framework, RTOs will not exist prior to December 15, 2001, *see* Order No. 2000, 65 Fed. Reg. at 812, FERC imposed interim mitigation measures in the East Region emulating many of the anticipated functions of an RTO. *Am. Elec. Power Co.*, 90 F.E.R.C. ¶ 61,242 at 61,789. Thus, in the East Region, New AEP must have ATC calculated and market monitoring conducted by an independent party. This third party would review generation dispatch information, steps taken to relieve transmission constraints, and the volume and price of energy after relief steps were taken. FERC stated, "[w]e believe that such data are necessary to determine whether operations or wholesale transactions involving Applicants are unduly discriminatory or preferential or show evidence of the exercise of market power." *Id.* Third, although FERC did not expressly identify the consequences of any transgressions of these requirements, the Commission stated that it would use its "authority under Section 203(b) of the [Federal Power Act] to address any concerns, and order further

procedures as appropriate." *Id.* at 61,789–90 (footnote omitted).

Wabash filed a Request for Rehearing on April 14, 2000, challenging FERC's order approving the merger. The principal points raised by Wabash in its petition for rehearing were, as follows:

- The Commission identified serious problems with the merger, expressly recognizing that the merger increased Applicants' ability to foreclose competitors by strategic manipulation of generation, but approved the merger without conditioning it in a manner that even purports to address this significant threat to the public interest.

- The Commission recognized, but failed to address the potent arguments of Wabash Valley ... that Applicants' participation in the Alliance RTO, even if that RTO were to satisfy the Commission's general requirements for FERC approval, would be insufficient to mitigate the Applicants' merger enhanced market power.

- The Commission erred by failing to insist upon implementation of Applicants' RTO commitment before consummation of the merger.

- The Commission failed even to recognize, much less address, intervenor demonstrations that the merger would seriously adversely affect transmission availability to others.

- The Commission accepted as "ratepayer protection" provisions wholly inadequate to hold ratepayers harmless from the merger.

*Request for Rehearing, reprinted in* J.A. 370, 373. FERC denied the request for rehearing on May 15, 2000, 91 F.E.R.C. ¶ 61,129, 2000 WL 627536, and Wabash petitioned this court for review on July 7, 2000.

## II. ANALYSIS

### A. Jurisdiction and Ripeness

FERC initially argues that judicial review is precluded in this case, because Wabash is not an aggrieved party, the case is not ripe, and Wabash failed to raise many of its arguments below, as required by § 313 of the Federal Power Act. We conclude that Wabash is aggrieved and the case is ripe, but that many of Wabash's claims have been forfeited because they were not properly raised with FERC in the first instance.

### 1. Standing

The Federal Power Act provides that "[a]ny party to a proceeding ... aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order" by filing suit within 60 days. 16 U.S.C. § 825*l*(b). Under FERC regulations, Wabash, as an intervenor, was a party to the AEP-CSW merger application proceeding. *See* 18 C.F.R. § 385.214 (1999). Parties are "aggrieved" under the Federal Power Act if they satisfy both the constitutional and prudential requirements for standing. *Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364, 366 (D.C.Cir.1998) (quoting *Bennett v. Spear*, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)). In this case, as a competitor crying foul, Wabash satisfies prudential standing requirements. *Louisiana Energy*, 141 F.3d at 366–67 (stating "as a competitor and customer [petitioner] comes within the zone of interests of the Federal Power Act and hence has prudential standing").

FERC nonetheless argues that Wabash fails to satisfy the standing requirements imposed by Article III of the Constitution. This "irreducible constitutional minimum" of standing requires: (1) that the plaintiff have suffered an "injury in

fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett,* 520 U.S. at 167, 117 S.Ct. 1154 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). FERC contends in particular that Wabash lacks standing because the harm that it alleges is based only on injuries that might arise from New AEP's exercise of market power in the future. In other words, according to FERC, the injuries asserted by Wabash are merely speculative. We disagree.

■ Parties suffer cognizable injury under Article III when an agency "lift[s] regulatory restrictions on their competitors or otherwise allow[s] increased competition." *Louisiana Energy,* 141 F.3d at 367. Wabash asserts that it will be injured by New AEP's market power which FERC has allowed by approving a merger with inadequate conditions. This claim satisfies the "injury" prong of Article III standing. *See Associated Gas Distribs. v. FERC,* 899 F.2d 1250, 1259 (D.C.Cir.1990) (finding standing when "the challenged action authorizes allegedly illegal transactions that have the clear and immediate potential to compete with the petitioners' own sales"). Wabash likewise meets the remaining two prongs of the constitutional standing inquiry. Its competitive injury is fairly traceable to FERC's decision to approve the merger. *See America's Cmty. Bankers v. FDIC,* 200 F.3d 822, 827 (D.C.Cir.2000). And a favorable decision

by this court could result in a remand to FERC which, in turn, might impose conditions that more severely limit New AEP's exercise of market power. This possibility, even though far from certain, satisfies the redressability requirement. *Northeast Energy Assocs. v. FERC,* 158 F.3d 150, 154 (D.C.Cir.1998). Wabash, therefore, has Article III standing to seek judicial review.

2. Ripeness

■ Ripeness requires the evaluation of "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Whitman v. Am. Trucking Ass'ns, Inc.,* 531 U.S. 457, 121 S.Ct. 903, 915, 149 L.Ed.2d 1 (2001) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). A case is ripe "when it presents a concrete legal dispute and no further factual development is essential to clarify the issues and there is no doubt whatever that the challenged agency practice has crystallized sufficiently for purposes of judicial review." *Rio Grande Pipeline Co. v. FERC,* 178 F.3d 533, 540 (D.C.Cir.1999) (citations and internal quotation marks omitted). This dispute meets these criteria.

■ Wabash seeks review of a specific agency decision to allow the merger of AEP and CSW. FERC made its decision after a lengthy hearing before an ALJ in which Wabash and numerous other intervenors put on extensive evidence challenging the merger. It does not matter that the merger occurs at a time when the regulatory regime is changing. What matters is that the decision approving the merger is final and the standards for assessing the Commission's judgment are clear and easy to apply.

### 3. Wabash's Failure to Present Certain Claims to FERC in the First Instance

■■■ Petitioners seeking review of a FERC order must first "petition for rehearing of those orders and must *themselves* raise in that petition *all* of the objections urged on appeal." *Platte River Whooping Crane v. FERC,* 876 F.2d 109, 113 (D.C.Cir.1989) (citing 16 U.S.C. § 825*l*(b) and *ASARCO, Inc. v. FERC,* 777 F.2d 764, 774 (D.C.Cir.1985)). Section 825*l*(b) commands that "[n]o objection to the order of the Commission shall be considered ... [unless] urged before the Commission in the application for rehearing." 16 U.S.C. § 825*l*(b). This is an unusually strict requirement that will not be ignored by the courts. *ASARCO,* 777 F.2d at 774. And "[n]either FERC nor this court has authority to waive these statutory · requirements." *Platte River Whooping Crane,* 876 F.2d at 113. Therefore, the failure of FERC to challenge a petitioner's objection on the ground that it was not raised below does not remove this court's independent obligation to determine whether, in fact, the argument is properly before us.

Many of the objections raised by Wabash in its petition for review were not raised in the first instance in an application for rehearing to FERC. The court therefore has no jurisdiction to consider these objections. In particular, Wabash did not seek rehearing on its claims that FERC failed to make essential findings of fact, adequately explain its decision, define the relevant markets, account for potential competition between AEP and CSW, and defer approval of all mergers until RTO performance could be evaluated.

■■■ There is one claim that has been raised by Wabash that may be considered by the court even though it was not raised below. Wabash contends that FERC's merger was inconsistent with a subsequently released staff report. Though not raised in the application for rehearing by Wabash, this argument may be properly considered by this court because the Federal Power Act allows consideration of arguments raised for the first time on appeal if "there is reasonable ground for failure" to raise objections in the request for rehearing. 16 U.S.C. § 825*l*(b). Because this report was issued on November 1, 2000, several months after Wabash's rehearing request, this court has jurisdiction to review this challenge by Wabash.

Finally, there is one argument raised by Wabash on appeal that is hard to characterize. In its petition for rehearing to FERC, Wabash argued that, although the Commission had "expressly recogniz[ed] that the merger increased Applicants' ability to foreclose competitors by strategic manipulation of generation," the merger conditions did not "address this significant threat to the public interest." *Request for Rehearing, reprinted in* J.A. 374. On appeal, Wabash argues that "FERC completely ignored ... crucial evidence" of New AEP's "ability to manipulate 'imperfections' in the pertinent markets to their advantage." Petitioner's Br. at 37. How one assesses these two claims depends upon how one construes the reference to "crucial evidence." Wabash's two claims are not inconsistent if Wabash's argument to the court is meant to claim that FERC failed adequately to address a recognized threat to the public interest because it failed to consider crucial evidence. The claims are inconsistent, however, if Wabash's argument to this court is meant to say that FERC completely ignored the fact that the merger increased Applicants' ability to foreclose competitors by strategic manipulation of generation. We give Wabash the benefit of the doubt and accept the issue as raised, because the first construction seems more plausible. We must therefore address on the merits the

staff report claim, the crucial evidence claim, and two other claims Wabash raised in its petition for rehearing.

## B. Standard of review

 We review FERC's order under the familiar arbitrary and capricious standard. *Sithe/Independence Power Partners, L.P. v. FERC*, 165 F.3d 944, 948 (D.C.Cir.1999). Under § 203 of the Federal Power Act "FERC may approve a merger only if it 'will be consistent with the public interest.'" *Envtl. Action, Inc. v. FERC*, 939 F.2d 1057, 1061 (D.C.Cir. 1991) (quoting 16 U.S.C. § 824b(a)). "Public interest" encompasses "both the preservation of economic competition, as expressed in the antitrust laws of general application, and the various policies reflected in the statutes specific to energy regulation." *Envtl. Action*, 939 F.2d at 1061 (citations omitted). The principal public interest reflected in the Federal Power Act is "to encourage the orderly development of plentiful supplies of electricity and natural gas at reasonable prices." *NAACP v. FPC*, 425 U.S. 662, 669-70, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976) (footnote omitted).

## C. Wabash's claims

 Wabash claims that FERC's approval was arbitrary and capricious because: FERC improperly conditioned the merger on the future participation of New AEP in an RTO; FERC completely ignored crucial evidence of New AEP's ability to manipulate imperfections in the pertinent markets to their advantage; the merger is inconsistent with a recent FERC staff report; and the merger does nothing to eliminate rate pancaking, a type of rate inefficiency. These claims all fail.

First FERC did not condition the merger solely on future participation in an RTO. Rather, FERC also required interim measures that emulated the information-sharing features of an RTO to limit New AEP's ability to exercise its market power. *See Am. Elec. Power Co.*, 90 F.E.R.C. ¶ 62,171, at 61,789. These measures – market monitoring and calculation of ATC by independent parties – do not have any enforcement mechanisms attached. FERC can use its regulatory powers, however, to penalize noncompliance. Under § 205 of the Federal Power Act, FERC reviews all electricity transmission and sales to ensure that the rates are "just and reasonable." 16 U.S.C. § 824d(a). FERC, in some circumstances, allows electric utilities to engage in market-based pricing in lieu of the traditional cost plus reasonable rate of return rate calculation. *See, e.g., Cajun Elec. Power Coop., Inc. v. FERC*, 28 F.3d 173, 176. (D.C.Cir.1994). If, however, FERC finds that a rate charged is "unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate ... and shall fix the same by order." 16 U.S.C. § 824e(a). Thus, if the information disclosed by New AEP under the interim mitigation measures indicates a violation of the antitrust laws or the Federal Power Act, New AEP faces antitrust liability and the possibility of FERC setting its rates. These safeguards render the requirement of disclosure effective to limit New AEP's exercise of strategic behavior to circumvent FERC's merger conditions.

Wabash is also wrong in its claim that FERC completely ignored *crucial evidence* of New AEP's ability to manipulate imperfections in the pertinent markets to their advantage. As noted above, Wabash's petition for rehearing to FERC expressly acknowledges that the Commission did not ignore the problem of the potential for market manipulation. Therefore, the only question here is whether FERC's action was arbitrary and capricious for lack of consideration of some "crucial evidence" related to the issue. The "crucial evi-

dence" to which Wabash refers is "the merging parties' intent to improperly exert their market power." Petitioner's Br. at 37. This is a specious claim. First, it is clear that FERC understood that it was too easy for parties to engage in market manipulation under the Orders that preceded Order No.2000 – indeed, that was a principal reason for the adoption of Order No.2000. Second, FERC addressed the problem of possible manipulations by imposing conditions on the merger. It is unclear what other "crucial evidence" was before FERC that warranted consideration. Maybe Wabash means to suggest that officials in charge of New AEP had devious, albeit unannounced, intentions to defy the law without regard to FERC's regulatory requirements. If so, this surely is no basis upon which to grant the petition for review. If New AEP acts in violation of the law in the future it will face regulatory sanctions.

Wabash next claims that FERC's decision does nothing to eliminate rate pancaking. Pancaked rates arise when a transmission travels over the transmission systems of more than one system that each charge separate fees, much like the total tolls paid when driving on a route that includes both the Pennsylvania and New Jersey turnpikes. Though the mere existence of different owners of different parts of a transmission system does not necessarily lead to inefficient transmission, FERC found that one of the main benefits offered by RTOs would be "increased efficiency through regional transmission pricing and the elimination of rate pancaking." Order No.2000, 65 Fed. Reg. at 829. Whether the AEP–CSW merger eliminated rate pancaking was not a discrete issue under consideration by FERC, because § 203 of the Federal Power Act merely mandates the determination of whether the merger is consistent with the public interest. By forcing New AEP to transfer its transmission assets to a RTO, FERC,

in fact, significantly reduced rate pancaking. Absent a mechanism creating national transmission pricing, it is hard to understand how *any* merger could, by itself, eliminate all rate pancaking. In any event, that other changes to FERC policy might also improve the public interest is simply irrelevant to the validity of the merger decision. And it certainly was not arbitrary and capricious for FERC to find that a merger that did not fully eliminate rate pancaking was nonetheless in the public interest.

██ Finally, Wabash claims that the decision to approve the merger is arbitrary and capricious because it is inconsistent with a staff report produced by FERC on November 1, 2000. This claim fails under the holding of *Union Pac. Fuels, Inc. v. FERC,* 129 F.3d 157, 164 (D.C.Cir.1997). Only when "FERC has formally altered its policy after issuing an order challenged before us" does this court consider the change. *Id.* A staff report following the issuance of a Commission order is not a superceding order; therefore, the issuance of such a report "play[s] no role in our determination of the order['s] legality." *Id.*

### III. CONCLUSION

For the foregoing reasons, Wabash's petition for review is denied.

*So ordered.*